In the Matter of the Complaint of the **INDIANA PAYPHONE ASSOCIATION, INCORPORATED, an Indiana Not–For–Profit Incorporated Association, Appellant–Complainant,**

v.

**INDIANA BELL TELEPHONE COMPANY, INC., Appellee–Respondent.**

No. 93A02–9510–EX–618.

Court of Appeals of Indiana.

Dec. 29, 1997.

Rehearing Denied March 4, 1998.

Richard E. Aikman, Jr., Peter S. Kovacs, Stewart & Irwin, Indianapolis, for Appellant–Complainant.

A. David Stippler, Indianapolis, Stanley C. Fickle, Barnes & Thornburg, Indianapolis, for Appellee–Respondent.

## OPINION

BAKER, Judge.

Appellant-complainant, The Indiana Payphone Association [IPA], appeals the determination of the Indiana Utility Regulatory Commission [Commission] that Appellee-respondent, Indiana Bell Telephone Company [Bell], had not engaged in certain illegal, anticompetitive practices in the payphone business. Specifically, IPA has made the following allegations: 1) the rates charged to Independent Payphone Providers [IPPs] by Bell for access to the telephone network are excessive, creating an anti-competitive, bottleneck monopolist price squeeze; 2) Bell's "Winback" program, which rewards Bell employees for reporting the location of independent payphones, constitutes an illegal preference; and 3) the Commission erred by not taking administrative notice of a particular decision issued by the Illinois Commerce Commission.

### FACTS

Before 1988, all payphones in Indiana were owned and operated by various Local Exchange Companies [LECs], such as Bell. However, in 1988, the Commission opened the public payphone market to competition to allow private, independent payphone provid-

ers, the IPPs, to own and operate payphones. The IPA is an organization consisting of approximately 15 IPPs.

In order for an IPP to install an operational payphone, it must purchase an access line to the telephone network, as well as other functionalities (such as directory assistance), from an LEC, such as Bell. The rate structure charged IPPs by Bell for access to the network was set in Cause No. 38158 in which the Commission found that the rates should be treated similarly to single line business customers. As such, the rates include a contribution to support the joint and common costs of Bell to subsidize the maintenance of universally affordable residential telephone service. IURC Cause No. 38158; *In re Indiana Bell Telephone Co., Inc.*, 72 PUR4th 1, 26–27 (Ind.P.S.C.1985) (Contribution from business rate service has historically provided a greater contribution to Indiana Bell's joint and common costs in order to promote the social policy of universally affordable residential telephone service). In 1992, the IPA initiated the present action before the Commission asserting that the rates charged by Bell for access to the network (which were set by the Commission) were excessive and, when combined with the Commission's order limiting the price of a local telephone call to twenty-five cents, created an illegal, anticompetitive, "bottleneck monopolist price squeeze" favoring Bell over the IPPs in the competitive payphone business.

Additionally, the IPA challenged Bell's "Winback" program as an illegal cross-subsidization of its payphone operations. Bell employs almost 5000 persons in Indiana. Through the Winback program, Bell offers rewards to its employees for identifying and reporting the locations of payphones operated by IPPs in order that Bell can direct its marketing efforts toward those locations. IPA argues that this company-wide marketing program (which includes employees devoted to its noncompetitive operations) illegally cross-subsidizes Bell's competitive payphone operations.

In 1994, the Commission held an evidentiary hearing on IPA's complaints which lasted more than a week. IPA requested that Bell place its payphone operations in a separate subsidiary or accounting entity to better foster competition. The Commission denied the

IPA's requested relief. This appeal followed. Additional facts are supplied as necessary.

## DISCUSSION AND DECISION

### I. Standard of Review

■ The Commission's purpose is to insure that public utilities provide constant, reliable, and efficient service to Indiana citizens. *Office of Utility Consumer Counselor v. Public Service Company of Indiana, Inc.*, 463 N.E.2d 499, 503 (Ind.Ct.App.1984). Historically, the Commission has been charged with supplying the missing element of competition to protect the public from excessive charges. *Public Service Commission v. Indiana Bell Telephone Co.*, 235 Ind. 1, 130 N.E.2d 467, 481 (1955). Today's case, which arises in the relatively new era of the regulation of the imperfectly competitive telecommunications industry, calls upon the Commission to ensure that effective competition takes place between Bell and its private competitors.

■ The Commission's rate making function is legislative rather than judicial. *Office of Utility Consumer Counselor*, 463 N.E.2d at 503. Ordinarily, the courts are not authorized to determine whether one rate is preferable to another or to revise a rate schedule imposed by the Commission. *Public Service Commission*, 130 N.E.2d at 475. The party attacking rates set by the Commission has the burden of demonstrating that the rates are unlawful. *Id.* at 474. When reviewing a decision of the IURC, we neither reweigh the evidence nor substitute our judgment for that of the Commission. *Citizens Action Coalition, Inc. v. NIPSCO*, 555 N.E.2d 162, 165 (Ind.Ct.App.1990). We will disturb the Commission's order only when the record viewed as a whole clearly indicates the Commission's decision was made without a reasonably sound evidentiary basis. *Id.* The complicated questions related to utility rate-making are particularly within the scope of the Commission's skills, resources, and expert judgment, and are not amenable to precise mathematical quantification. *Id.* at 163. The Commission is imbued with broad discretion necessary to perform its legislative function and achieve the goals.

*Office of Utility Consumer Counselor,* 463 N.E.2d at 503.

### I. Excessive Local Exchange Access Rates—Price Squeeze

■ As noted earlier, IPA asserts that Bell's rates for local exchange access are excessive, and thus, curtail competition in the payphone business. In its brief, IPA presents this court with an analysis of the methodology employed by its experts at the hearing before the Commission to support its assertion that the rates charged by Bell for access to the telephone network exceed its costs by 345%. The IPA also asserts that very little competition has taken place in the payphone business since deregulation, and, that Bell (and other LEC companies) still command approximately 87% of the payphone market. IPA asserts that, since 1989, the IPPs have only increased their market share by about 3%. Bell's experts, however, opined that IPA's experts' methodology was flawed in several respects and failed to take into consideration the economies of scope and scale that Bell enjoys as a large, vertically-integrated company. Bell's experts opined that placing Bell's payphone operations in a subsidiary would be detrimental to the public interest in providing affordable payphone service.

■ The Commission may properly accept the opinion of one expert over another. *Office of Utility Consumer Counselor v. Citizens Telephone Corporation,* 681 N.E.2d 252, 258 (Ind.Ct.App.1997). As noted above, we will not reweigh the evidence nor substitute our judgment for that of the Commission. The record provides a reasonably sound evidentiary basis for the Commission's decision, and, therefore, we must conclude that IPA has failed to carry its burden of demonstrating that Bell's rates for access to the telephone network were illegal.

■ Local exchange access has long been considered a natural monopoly or a "local bottleneck" too expensive for new competitors to duplicate. Charles F. Phillips, Jr., *The Regulation of Public Utilities, Theory and Practice* 779 (3d ed. 1993). Network access charges are only one of the many issues faced in the regulation of the imperfectly competitive telecommunications industry. *Id.* at 782. It is undisputed that Bell charges the IPPs the lawful rate established by the Commission for access to the telephone network. The decision of whether the access rates charged to IPPs should be reduced to better foster competition in the payphone industry is a matter entrusted to the Commission's legislative discretion.

### II. Winback

■ The IPA asserts that Bell's Winback program runs afoul of I.C. 8–1–2–105 which reads as follows:

**Rates and charges; discrimination; penalty; exceptions**

(a) No public utility may make or give any undue or unreasonable preference or advantage to any person, or subject any person to any undue or unreasonable prejudice or disadvantage in any respect.

(b) Nothing in this chapter shall prevent any public utility from furnishing service free or at reduced rates to any of its employees and officers or retired employees and officers or from providing energy assistance under IND.CODE 12–14–11 [the Home Energy Assistance Program] to persons eligible for that assistance.

The IPA argues the language of the statute is sufficiently broad to prohibit Bell from using employees from its noncompetitive operations to subsidize its competitive payphone operation. We disagree.

■ As stated in *JKB, Sr. v. Armour Pharmaceutical Co.,* 660 N.E.2d 602, 605 (Ind.Ct.App.1996), *trans. denied:*

When interpreting a statute, the foremost objective is to determine and effect legislative intent. Statutes must be construed to give effect to legislative intent, and courts must give deference to such intent whenever possible. Thus, courts must consider the goals of the statute and the reasons and policy underlying the statute's enactment. Courts are to examine and interpret a statute as a whole, giving words their common and ordinary meaning, and not overemphasize a strict, literal, or selective reading of individual words. Words and phrases are taken in their plain, ordinary, and usual meaning unless a

different purpose is manifested by the statute. Where possible, every word must be given effect and meaning, and no part is to be held meaningless if it can be reconciled with the rest of the statute.

Statutes relating to the same general subject matter are in pari materia and should be construed together so as to produce a harmonious statutory scheme. *Sanders v. State,* 466 N.E.2d 424, 428 (Ind.1984). An administrative agency's interpretation of its own statute is afforded considerable weight. *Teledyne Portland Forge v. Ohio Valley Gas Corporation,* 666 N.E.2d 1278, 1281 (Ind.Ct. App.1996). However, the reviewing court is not bound by the agency's interpretation and will reverse if the agency incorrectly interpreted the statute. *Id.; Peabody Coal Co. v. Indiana DNR,* 629 N.E.2d 925, 928 (Ind.Ct. App.1994) (Agency's incorrect interpretation of a statute is entitled to no weight); *summarily affirmed,* 664 N.E.2d 1171.

■ The title of I.C. 8–1–2–105 indicates that it governs discrimination with respect to "rates and charges." The thrust of the several statutes which prohibit utilities from granting preferences or advantages involve the provision of utility services or the charging of rates to utility customers. Nothing in the language of I.C. 8–1–2–105 or in any other statute suggests that certain internal marketing programs run by utilities may be illegal. As noted earlier, Bell is a large, vertically integrated company which enjoys economies of scope and scale. Even if the Winback program could appropriately be considered as providing some subsidization of Bell's competitive payphone operations by its noncompetitive operations, we cannot conclude that the legislature intended to prohibit Bell from running the type of marketing program involved here. Under the circumstances, we cannot conclude that the Commission erred in determining that Bell's Winback program was not illegal. Whether Bell should be required to place its payphone operations in a separate subsidiary to eliminate cross-subsidization is matter entrusted to the Commission's legislative function.

### III. Administrative Notice

■ Finally, the IPA argues that the Commission erred by failing to take administrative notice of a regulatory decision issued by the Illinois Commerce Commission because it involved the Illinois counterparts to the IPA and Bell and addressed many of the same issues included in the present case. In effect, the Illinois Commerce Commission determined that Bell's payphone services should be considered separate and distinct from its noncompetitive operations to better foster competition.

While the Illinois authorities have wrestled with many of the same difficulties in regulating the imperfectly competitive payphone industry that are faced in the present case, we cannot conclude that the Illinois decision is particularly relevant or helpful to the resolution of the precise issues involved in the case at bar. Illinois Bell and the Illinois Independent Coin Payphone Association were able to resolve most of their differences by agreement and/or stipulation based on the distinctive regulations promulgated under the Illinois Public Utilities Act. Even had the Illinois decision been more closely analogous to the case at bar, it would not have constituted controlling authority requiring the Commission to decide the present case one way or the other. Therefore, even if the Commission erred by failing to take administrative notice of the Illinois decision, reversal would not be warranted because IPA has failed to carry its burden of demonstrating prejudice to its substantial rights. *Indiana State Board of Embalmers and Funeral Directors v. Kaufman,* 463 N.E.2d 513, 520 (Ind.Ct.App.1984) (Harmless error doctrine applies to the judicial review of administrative hearings).

The decision of the Commission is affirmed.

RUCKER and BARTEAU, JJ., concur.